Jimenez v. Martinez, No. 19-1-11 Bncv (Carroll, J., August 5, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# VERMONT SUPERIOR COURT

| SUPERIOR COURT | CIVIL DIVISION |
|---|---|
| Bennington Unit | Docket No. 19-1-11 Bncv |

| | |
|---|---|
| **Jennifer Jimenez** <br><br> **Jerison Toribio, individually and in his capacity as Administrator of the Estate of Juana Jimenez** <br><br> **Jerison Toribio, individually and in his Capacity as Administrator of the Estate of Jasmil Almodovar a/k/a Jasmil Jimenez** <br><br> **Jerison Toribio, individually and in his Capacity as Administrator of the Estate of Cesar Diaz a/k/a Cesar Jimenez** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **Ana Maria Toribio, as Administrator of the Estate of Robin C. Martinez, and John H. Miller,** <br><br> **Defendants.** | |

### ORDER ON PLAINTIFFS' MOTION FOR PARITIAL SUMMARY JUDGMENT (MOTION # 8), DEFENDANT'S MOTION FOR PARITIAL SUMMARY JUDGMENT (MOTION # 9), AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (MOTION # 11)

### Factual Background

*Jimenez v. Martinez* concerns a tractor-trailer accident that occurred along Route 7 in Pittstown, New York On June 6, 2010, around 4:56 a.m., a collision occurred between tractor-trailer and a Honda Pilot. Defendant, John Miller, drove the tractor-trailer and carried no passengers. Robin Martinez drove the Honda and carried four passengers: Juana Jimenez, Jasmil Jimenez, Cesar Jimenez, and Jennifer Jimenez. Miller and Jennifer survived; however, Martinez, Jimenez, Jasmil, and Cesar all died in the collision.

The collision occurred shortly after Martinez drifted into Miller's lane (the westbound lane). Shortly before the accident, Miller observed a car on the side of the road that looked like a police cruiser. The parties dispute whether this observation distracted Miller. Approximately 770 feet before the collision, Martinez was in Miller's lane. Miller took evasive action by turning into the oncoming lane between 120 feet and 165 feet away from the collision. Martinez steered back into his lane approximately 70 feet away from the collision. The near simultaneous movement into the eastbound lane caused the accident.

As background, a ten foot wide shoulder existed on Miller's right at the time of the accident. Professional drivers are trained to steer to the right when faced with an on coming vehicle in their lane. The accident occurred where the speed limit changes between fifty-five miles per hour and forty-five miles per hour. Miller traveled at approximately forty-one miles per hour and Martinez traveled at approximately fifty-four miles per hour (nine miles an hour above the speed limit). Miller was not under the influence of alcohol or drugs, he had rested, and he did not use his cell phone immediately before the collision.

All of the parties lived in Vermont. John Miller is a professional truck driver and lives in Brattleboro, Vermont. Miller had a Vermont commercial driver's license. The tractor-trailer was registered in New Hampshire. Before the collision, John Miller drove westbound on Route 7 as part of his employment with United Natural Foods. Plaintiffs drove eastbound on Route 7 to return to Bennington from New York City. Martinez and the Plaintiffs all lived in Bennington, Vermont before the collision. Martinez and Juana had a joint insurance policy with Progressive to cover the Honda. Juana worked at Southwestern Vermont Healthcare, in Bennington, before her death. Jasmil, Cesar, and Jennifer are all children of Juana. All three of the children were enrolled in school in Bennington. Juana also had a fourth child, Jerison Toribio, who lived in Manchester, Vermont at the time of the collision.

The Plaintiffs also had connections to New York. Before the collision, the Plaintiffs were driving back to Bennington from New York City. All three children involved in the collision were born in New York City. During the time when Jasmil, Cesar, and Jennifer were born, Juana was married to Omar Alexis Almodovar and the parties do not claim Robin Martinez was the father. Juana and Almodovar were married in New York City. The funerals took place in New York City and the Dominican Republic. Jennifer also filed for payment of medical expenses under New York's no fault insurance law. Plaintiffs were entitled to up to $5,000 in coverage for medical payments under their Vermont policy and their payments totaled approximately $1,400.

## Procedural History

On March 27, 2013, Plaintiffs filed for partial summary judgment (motion # 8). Plaintiffs argued the Court must apply Vermont law to decide this case. On May 13, 2013, Miller filed a cross-motion for partial summary judgment (motion # 9). Miller's cross-motion for partial summary judgment opposes Plaintiffs' motion and argues the Court must apply New York law to this case. On June 4, 2013, Plaintiffs replied to Miller's cross-motion for partial summary judgment (motion # 9). On June 20, 2013, Miller replied to Plaintiff's opposition (motion # 9). On June 7, Miller also moved for summary judgment (motion # 11). Applying New York law, Miller argues he was not negligent because he took a reasonable course when faced with an

2

emergency situation. On July 10, 2013, Plaintiffs opposed Miller's motion for summary judgment (motion # 11). Plaintiffs argue, even applying New York law, there are triable issues of material facts on whether Miller was negligent.

## Standard of Review

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). The Court makes all reasonable inferences and resolves all doubts in favor of the non-moving party. *Lamay v. State*, 2012 VT 49, ¶ 6, 191 Vt. 635.

## Discussion

1. *Conflict of Laws and the Most Significant Interest Test*

The first issue raised by these motions (motions # 8, 9) is which state's laws govern. To determine which state's laws to apply, the Court must apply the most significant relationship test. *See Myers v. Langlois*, 168 Vt. 432 (1998). Although this case presents facts that are favorable to both sides, the Court will apply Vermont law because the parties are all from Vermont and applying Vermont law would not substantially interfere with New York's policies.

The Vermont Supreme Court issued decisions that indicate when the trial court should apply Vermont or Canadian law for cases that involve auto accidents either in Quebec or with residents of Quebec. The Court first adopted the most significant relationship test in *Amoit v. Ames*, 166 Vt. 288, 292 (1997). Instead of using the older location based test (the lex loci), the Court adopted the restatement's significant relationship test. *Id.* The significant relationship test is more appropriate because state and national boundaries are less significant now than in the past and the relationship test allows judges to weigh the policies and values at stake. *See id.* The Supreme Court remanded to the trial court to make fact findings on the relationship that existed.

The Vermont Supreme Court first applied the most significant relationship test in *Miller v. White*. *See* 167 Vt. 45 (1997). In *Miller*, both the plaintiff and the defendant were residents of Vermont. *Id.* at 46. They drove to Quebec, in a single car, to take advantage of the lower drinking age. *Id.* After leaving the bar, the defendant drove off of the road and injured the plaintiff. *Id.* at 47. The plaintiff filed suit in Vermont and requested the Court apply Vermont law; the defendant requested the court apply Quebec law. *Id.*

The court applied the most significant relationship test and determined Vermont law should apply. *Id.* at 53. The court started its analysis by referring to the general principals of the restatement's view on conflict of laws. The court considered:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,

3

(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws, § 6; *see Miller*, 167 Vt. at 48. The court then considered more specific factors that apply to tort cases. *See Miller*, 167 Vt. at 48. Under the Restatement, courts should consider:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws, § 145(2).

The court applied these factors to resolve "the competing interests of the domicile of the parties, Vermont, and the place of the accident, Quebec." *Miller*, 167 Vt. at 49. Quebec applies a pure no-fault system to automobile accidents. *Id.* at 49–50. The purpose of the Quebec law is to expedite payment to accident victims, reduce litigation, and reduce auto insurance costs. *Id.* at 50. Quebec law also indicates accidents in Quebec between residents of the same foreign country should generally be analyzed under the law of the foreign jurisdiction. *Id.* at 51. In contrast, Vermont "retains a traditional tort system of recovery for automobile accidents." *Id.* The purpose of Vermont's system is to fully compensate victims of negligence. *See id.*

The court determined Vermont law should apply because Vermont had the strongest interest in this case. *See id.* at 52. Both parties were domiciled in Vermont. Vermont has an interest in deterring risky behavior, such as driving to Vermont after drinking. *See id.* Additionally, the relationship of the parties was centered in Vermont. *Id.* at 53. Finally, applying Vermont law to this case would not jeopardize the Quebec system. *See id.*

The following year, the court considered the mirror image to *Miller*. *See Myers*, 168 Vt. at 434, n. 2. In *Myers*, a group of Quebec residents drove to Vermont to play bingo. *Id.* at 433. The driver made an allegedly improper left turn. *Id.* The car was then struck by a Vermont driver. *Id.* Three of the passengers died. *Id.* Two of the decedents incurred medical expenses before the collision and their next of kin received coverage under Quebec's law. *Id.* at 434.

Again, the court applied the substantial relationship test to determine which jurisdiction's laws to apply. *Id.* As in *Miller*, the court used the restatement factors and discussed the differences between the Vermont and Quebec liability systems. *See id.* at 435–36. The court then found that the parties' residency and relationship was centered in Quebec. *Id.* at 437. The Court also noted this case concerned the allocation of loses rather than the regulation of conduct and Quebec has a strong policy in favor of the allocating losses on a no-fault basis. *See id.* at 437–38. Therefore, the court applied Quebec law to the case. *See id.* at 438.

In a fourth case, the court applied Vermont law to a crash involving Quebec residents because their relationship centered in Connecticut. *See Martineau v. Geurtin*, 170 Vt. 415, 419–20, 422 (2000). The two parties involved in a single-car accident were both Canadian citizens domiciled in Quebec. *Id.* at 416. Both men worked in Connecticut, but did not live there year round. *Id.* The men both had families in Quebec. *Id.* The two men set out from Quebec to drive to Connecticut, but the defendant lost control of the vehicle in Vermont. *Id.*

The court applied the most significant relationship test, but noted "the law of the state where the injury occurred is presumed to govern in wrongful death actions unless another state has a more significant relationship to the parties…" *Id.* at 418. The court then highlighted the factual differences existed between *Martineau* and *Miller* and *Myers*. *Id.* at 419. Most notably, the parties had lived and worked in Connecticut for seven years, the car was registered and insured in Connecticut, and the parties were on their way to Connecticut. *Id.* at 419–20. Under these circumstances, the court found the relationship centered in Connecticut. *Id.* Moreover, the court noted Connecticut and Vermont shared similar traditional tort recovery system for automobile accidents. *Id.* at 420. Quebec's interest in the case was not sufficiently strong to override all of these other factors, and the court applied Vermont law. *See id.* at 421–22.

The Vermont Supreme Court also cited *Jean v. Francois*, a New York trial court case. 168 Misc.2d. 48 (N.Y. Sup. Ct. 1996); *see Myers*, 168 Vt. at 437. *Jean* involved an automobile accident in New York where all of the parties involved were residents of Quebec. 168 Misc.2d. at 48–49. Like Vermont, the New York court analyzed whether to apply New York or Quebec law under a "greatest interest" standard. *Id.* at 50. The court determined Quebec law should apply because all of the parties were domiciled in Quebec and nothing in Quebec's regulatory scheme was obnoxious to the point where the New York court would set it aside. *Id.* at 51.

The facts of the instant case are mixed, but generally favor applying Vermont law. All of the parties were residents of Vermont at the time of the collision. Juana worked in Bennington and the three children attended school in Bennington. Moreover, Plaintiffs' vehicle was registered and insured in Vermont. The parties did not plan to move to New York, even if the Plaintiffs lived in New York in the past and had family in New York. Plaintiffs were also on their way back to Vermont when the collision occurred. On the other hand, some of the facts favor applying New York. The accident and the conduct that led the accident all occurred in New York. Additionally, three of the Plaintiffs, the children, were born of a New York marriage. Juana had been married in New York, although that marriage ended several years before the accident. The Plaintiffs also had family in New York. Additionally, there was no prior relationship between Plaintiffs and Miller, even if all of the parties resided in Vermont.

The domicile of the parties overwhelms the facts connecting the parties to New York. *Miller* and *Myers* indicate that where the parties are all domiciled in one jurisdiction, the Court should generally apply the law of that jurisdiction. *Martineau* then shows the limits of this rule. The Court does not need to apply the parties' domicile where the accident occurred elsewhere and the parties have a substantial connection to another jurisdiction, particularly if that jurisdiction has laws similar to Vermont's laws. In this case, the accident occurred elsewhere, but the parties did not have a substantial connection to another jurisdiction. All of the parties

5

involved were domiciled in Vermont and had substantial connections to Vermont. None of the other evidence is enough to suggest New York has a more significant interest in this case.

The Court must also consider the differences between New York and Vermont law. As stated above, Vermont applies a traditional tort recovery system for recovery of damages in automobile accidents. *See Miller*, 167 Vt. at 51. Conversely, New York has a limited no-fault system. Under New York, parties involved in an injury may recover up to $50,000 in damages, regardless of fault, for non-economic damages. *See* McKinney's Insurance Law §§ 5102 (a), 5103(a), 5104(a). The parties may only sue to receive more damages in a limited number of exceptions. *See* McKinney's Insurance Law § 5104(a). One of the exceptions, which would be satisfied in this case, occurs when the plaintiff suffers serious bodily injury or death. *See id.* Like Quebec, the purpose of the New York law is to expedite recovery, reduce litigation, and reduce insurance premiums. *See Walton v. Lumbermens Mut. Casualty Co.*, 666 N.E.2d 1046, 1048 (N.Y. 1996). The law is more intended to allocate losses than to regulate behavior—driving in the left lane is impermissible in New York and Vermont. *See id.*

Defendant argues that relying on *Miller* and *Myers* oversimplifies the analysis because they do not take into account differences between the New York and Quebec no fault laws. Although there are real differences between the laws, as shown by the New York court's analysis in *Jean*, this is not the correct analogy. *See* 168 Misc.2d at 51. The relevant comparison is not between New York and Quebec but between Vermont and New York. *Miller*, *Myers*, and *Martineau* are helpful to the extent New York and Quebec have similar laws.[1] The most important question is whether applying Vermont law would impair the policies of New York. In this case, as in *Miller*, the policies of New York would not be impaired by applying Vermont law. *See* 167 Vt. at 51.

Plaintiffs are entitled to partial summary judgment on the conflict of law issue because there are no disputed, material facts that relate to this issue and they are entitled to judgment as a matter of law. *See* V.R.C.P. 56(a). On the other hand, Defendant is not entitled to partial summary judgment because he is not entitled to judgment as a matter of law. *See id.*

*2. Waiver*

Miller also argues Plaintiffs waived their argument that Vermont law should apply by accepting the benefits of New York's no-fault policy to pay for their medical expenses. Miller notes Plaintiffs were represented by counsel when they accepted the payments. Plaintiffs counter they agreed to the hospitals submitting payments under New York scheme for administrative convenience and they were entitled to those amounts under their Vermont contract. In support of his argument, Miller cites two Vermont cases. *See North v. Simonini*, 142 Vt. 482 (1983); *Chimney Hill Owners' Ass'n v. Antignani*, 136 Vt. 446 (1978). Each of these cases discusses

---

[1] The analysis of competing interests between New York and Vermont is similar to the analysis between Vermont and Quebec. New York law does not present the full no-fault coverage offered by Quebec. Nevertheless, the structure and purpose of the New York is similar to that of Quebec, at least when compared to Vermont. New York aims to accomplish many of the same goals as Quebec by allocating losses. New York's no-fault law does not regulate behavior in a manner that is inconsistent with Vermont law. Accordingly, applying Vermont law would not contradict the policies of the Restatement.

waiver generally in the context of a contract, but is not specific to a choice of law issue (much less an insurance dispute between jurisdictions). *North* indicates a waiver can occur by a "voluntary relinquishment of a known right." 142 Vt. at 485. *Chimney Hill* adds waiver may occur by words or conduct. 136 Vt. at 453.

In this case, Plaintiffs did not voluntarily relinquish a known right. Plaintiffs signed some paper work that allowed the hospitals to get paid under the New York law. Plaintiffs were entitled to coverage for these bills under their Vermont policy. No evidence suggests that Plaintiffs intended to relinquish their right to have Vermont law apply, or even that they thought of the choice of law issue as a known right. Therefore, Plaintiffs did not waive their right to argue Vermont law applies. *See Rappaport v. Estate of Banfield ex rel. Hoguet*, 2007 VT 25, ¶ 20, 181 Vt. 447 (declining to find waiver where the plaintiffs did not show the defendants voluntarily relinquished a known right).

### 3. The Emergency Doctrine (Motion # 11)

Miller also moves for summary judgment on the theory that he was not negligent because he made a reasonable response to an emergency situation, even if his response was not the best response in hindsight. The issue is whether the emergency doctrine entitles Defendant to summary judgment because he made a reasonable response to a cross-over situation. Defendant cites many New York cases about the emergency doctrine and cross-over cases. As discussed above, the Court will apply Vermont law to answer this question.

An older Vermont case indicates whether Defendant was negligent under these circumstances is a question of fact. *See Frenier v. Brown*, 116 Vt. 538 (1951); *see also Rotman v. Progressive Ins. Co.*, --- F.Supp.2d ---, No. 5:12-cv-67, 2013 WL 3293531, *14 (D.Vt. June 28, 2013) (quoting *Frenier* to explain the sudden emergency doctrine in Vermont). In *Frenier*, the plaintiff observed the defendant traveling in the opposite direction in the wrong lane. *Id.* at 540. The plaintiff turned to his left (into the defendant's lane) at approximately the same time the defendant turned to her right (into her lane). *Id.* at 540–41. The vehicles collided. *Id.* at 541. The plaintiff sued the defendant for negligence, won at a jury trial, and the defendant moved for directed verdict because she argued plaintiff committed contributory negligence. *Id.* at 540. The facts differ from this case in that the plaintiffs here travelled in the car that originally crossed the center line, but the analysis for negligence is the same.

The Vermont Supreme Court provided some helpful language on the standard of care in this situation.

> One driving an automobile along a public highway who sees a car approaching on the wrong side of the road has, at the outset, a right to assume that the driver will observe the law of the road and seasonably move over to his right so as to pass without interference. He may proceed on this assumption until he sees or in the exercise of reasonable care ought to see that it is unwarranted. His care and diligence is to be measured in view of this assumption. But he cannot for that reason omit any care the law requires of him.

*Id.* at 543.

> One who is put in a perilous position by the negligence of another cannot be regarded as guilty of contributory negligence if he takes such steps to protect himself as a reasonably prudent person might take, even though he might have avoided the injury by the use of better judgment and by taking another course than the one he adopted.

*Id.* at 544.

> We hold that, under the circumstances here shown, it cannot be said as a matter of law that the plaintiff was guilty of contributory negligence in turning to the left to avoid the threatened collision. The question is what would or might a prudent person do in the situation that confronted the plaintiff and that question was for the determination of the jury.

*Id.* at 546.

*Frenier* indicates whether Defendant was negligent is a question of fact. *See id. Frenier* considered similar set of facts, although positions of the parties mirrored the instant case. *See id.* at 540–41. *Frenier* indicates that a motorist confronted with a sudden peril is not expected to show the same degree of judgment as a person with time to think. *See id.* at 544. Nevertheless, whether a motorist properly exercises his judgment in a crossover situation is a question of fact for the jury. *See id.* at 546. Accordingly, the Court must deny Defendant's motion for summary judgment because there are disputed facts. *See* V.R.C.P. 56(a).

## **ORDER**

The Court ***grants*** Plaintiff's motion for partial summary judgment (Motion # 8). The Court ***denies*** Defendant's motion for partial summary judgment (Motion # 9). The Court ***denies*** Defendant's motion for summary judgment (Motion # 11).

Dated at Bennington, Vermont on August 5, 2013

_____
Karen R. Carroll
Superior Court Judge

8